## A. M. HOLTER HARDWARE CO., APPELLANT, *v.* ONTARIO MINING CO., ET AL., DEFENDANTS.

NEWTON, Appellant.

CAIRD & HAWKSWORTH, Appellants.

MERCHANTS NATIONAL BANK, Respondent.

[No. 1176.]

[Submitted April 9, 1900.  Decided May 14, 1900.

*Mechanic's Lien—Mining Supplies—Liens—Running Account—Separate Contracts—Pleading—Amendment—Filing—Attachment Lien.*

1.  Code Civil Procedure, Sec. 773, authorizing the amendment of any pleading of course, once, by filing the same as amended, and serving a copy on the adverse party, does not apply to amendments made by order of Court; and where leave is given to amend an answer, and the amendment, rather than the answer as amended, is filed and served, the original answer is not superseded by the amendment, except as thereby changed.  *Obiter,* the better practice is to file the pleading as amended.
2.  Where an attachment issued by the Court in one county was levied on real estate in another, it was not essential to the establishment of a lien to file a transcript of the judgment in the other county, as provided by Code Civil Procedure, Sec. 1200.
3.  The fact that the sheriff's return to the writ of execution issued on the judgment was not filed within 60 days did not destroy the lien created by a levy of an attachment.
4.  Where the plaintiff sold mining supplies to defendant from time to time, and monthly bills were rendered therefor, and interest charged thereon, with the understanding that defendant was to be carried till he could make payment by shipping ore, such purchase did not constitute a continuing running account, but each was made under a separate contract, payment for which was due at the end of the month, from which time the 90 days required by Code Civil Procedure, Sec. 2131, for filing of a statement of a lien began to run.
5.  A written agreement for the purchase of certain machinery at a certain price, and also all castings required, in addition, at a certain figure, had reference only to the castings required for the machinery mentioned, and no mechanic's lien based on such an agreement could be enforced for other purchases.

*Appeal from District Court, Deer Lodge County; Theo. Brantly, Judge.*

ACTION by the A. M. Holter Hardware Company against the Ontario Mining Company and others to enforce a mechanic's lien.  From a judgment establishing a lien for part only of plaintiff's claim, and of the claims of certain defendants, plaintiff and defendants J. P. Newton and Caird & Hawksworth appeal.  Affirmed.

*Messrs. Stranahan & Stranahan, Messrs. Walsh & New-man,* and *Mr. E. Scharnikow,* for Appellants.

Cited: *Alvord* v. *Hendrie,* 2 Mont. 122; *Frankoviz* v. *Smith,* 34 Minn. 405; *Merchand Co.* v. *Cook,* 4 Iowa 116; *Kizer Lumber Co.* v. *Mosley,* 56 Ark. 548; *Helena S. H. & S. Co.* v. *Wells,* 16 Montana 65; *Craddock* v. *Dwight,* 85 Mich. 587; *State Sash & Door Co.* v. *N. D. E. L. Seminary,* 45 Minn. 254; Jones on Liens, Vol. II., Sec. 1435 and Sec. 1443; Phillips on Mechanics' Liens, Sec. 325; *Stine* v. *Austin,* 9 Mo. 554; *Skyrme* v. *Occidental Mill Co.,* 8 Nevada 219; *Lamb* v. *Hanneman,* 40 Iowa 41; *Schmeiding* v. *Ewing,* 57 Mo. 78; *O'Leary* v. *Burns,* 53 Miss. 171; *Central Trust Co.* v. *Railroad Co.,* 23 Fed. 673; *Jones* v. *Swan,* 21 Iowa 181; *Iowa Mortgage Co.* v. *Shanquest,* 70 Iowa 124; *Fulton Iron Works* v. *North Center Mining & Smelting Co.,* 80 Mo. 265; *Bruce* v. *Berg,* 8 Mo. Appeals, 204; *Jodd* v. *Duncan,* 9 Mo. Appeals, 417; *Kick* v. *Doerste,* 45 Mo. Appeals, 134; *Kearney* v. *Wardeman,* 33 Mo. Appeals, 447; Hofer's Appeal, 116 Pa. St. 360; *Trustees German Lutheran Church* v. *Heise,* 44 Md. 454; *Newell* v. *Wyendorff,* 9 Montana 254; *Gettings* v. *Buchanan,* 17 Montana 585; *Main* v. *Tappenèr,* 32 Cal. 206; *Wheaton* v. *Neville,* 19 Cal. 42; *Watt* v. *Wright,* 66 Cal. 202; *Sharp* v. *Baird,* 43 Cal. 206; *Schwartz* v. *Conel,* 71 Cal. 306; *Bruise* v. *Gates,* 80 Cal. 467; *Porter* v. *Pico,* 55 Cal. 105; *Capron* v. *Strout,* 11 Nev. 304; *Wortman* v. *Kleinschmidt,* 12 Montana 316; *Sheppard* v. *Wilkins,* 1 Ala. 64; *Purvis* v. *Kroner,* 18 Ore. 416; *Tucker* v. *Quimby,* 37 Iowa 17; *Ring* v. *Jamieson,* 2 Mo. App. 589; Am. & Eng. Ency. Law, Vol. I, p. 109, New Ed. p. 435; *Matthews* v. *Waggenhaeuser,* 83 Tex. 604; *Pickett* v. *Merchants Bank,* 32 Ark. 347; *Osborne* v. *Collier Co.,* 30 S. E. 449; *Smith* v. *Newbauer,* 144 Ind. 97; *Premier Steel Co.* v. *M. R. Co.,* 144 Ind. 621; *Patton* v. *Matter,* 52 N. E. 173; *Albright* v. *Smith,* 51 N. W. 592; *Miller* v. *Batcheler,* 117 Mass. 180; *Jones* v. *Murphy,* 64 Iowa, 165; *Rush* v. *Able,* 90 Pa. St. 158; *Hardware Co.* v. *McCarty,* 10 Colo. App. 201; *Mellor* v. *Valentine,* 3 Colo. 258; *Fitch* v.

*Baker*, 23 Conn. 565; *Ehlers* v. *Elder*, 51 Miss. 498; *Maryland Brick Co.* v. *Spilman*, 76 Md. 345.

*Messrs. McConnell & McConnell*, for Respondent.

**PER CURIAM.** Action to foreclose a material man's lien for merchandise sold and delivered to the defendant, the Ontario Mining Company, between November 2, 1895, and July 20, 1896. The articles furnished by the plaintiff to the mining company were received by the latter, and used in and about its mines. On August 1, 1896, the plaintiff hardware company filed its lien to secure the payment of a balance due on the account of the said mining company amounting to $4,430.79, and began suit on October 16, 1896. On July 29, 1896, the Merchants' National Bank, defendant and respondent herein, also brought suit against the Ontario Mining Company, defendant, for debts due by that company to the bank, and attached the property of the mining company. The Ontario Mining Company did not answer the hardware company's complaint, and its default was duly entered; but the defendant bank answered and contested the right of the plaintiff to a lien, and the right of certain other lienholders to liens upon the property,—the bank claiming an interest in the property charged, by virtue of its attachment, a judgment, execution, and sale. The case was tried to the court without a jury. Plaintiff obtained judgment against the mining company for the sum of $4,430.79; but the court adjudged that plaintiff's lien could only be enforced against the property of the mining company to secure the payment of $749.71, which was the value of such articles only as were sold by the plaintiff corporation to the mining company after May 1, and up to August 1, 1896. For goods sold and delivered prior to May 1, 1896, the court decided there was no lien. The plaintiff appeals from the order refusing a new trial, and from so much of the judgment as failed to allow it a lien for the whole debt.

Upon the trial it appeared that the amount of plaintiff's

claim was correct, and that the merchandise included in the
account of the sales was delivered to the defendant mining
company.   Nor was any objection interposed to the form of
the plaintiff's lien.   But the defendant bank objected to the
introduction of any testimony to establish the lien, for the
reason that the account, on its face, showed such an intermingling of lienable and non-lienable articles that the entire account failed to show any lien on its face, and that therefore
plaintiff failed to state any cause of action.   The court overruled this objection, and the following material evidence was
adduced:

D. P. Patenaude testified that he was the manager of the
plaintiff company; that his company had furnished the Ontario Mining Company supplies for about five years; that
some of the officers of the mining company would bring an
order for goods, and that he would O. K. it, have the goods
forwarded according to shipment instructions, and charge the
amount up to the account of the mining company; that the
account was not straightened between the plaintiff and the defendant companies upon the furnishing of each order, and
that at the time the materials were supplied his company considered the mining property ample security for the goods sold;
that the mining company made partial payments, and that no
interest was charged against them, although, on the bills rendered, these words appeared in print: "All accounts are due
on the first of the month following purchase.   Interest will be
charged after thirty days;" that the goods were sold on the
faith of the lien that plaintiff had for them against the mine,
and that they were not sold on the credit of the company;
that the account between the two companies was open and continuous; that witness' idea was that a lien could be placed upon the property of the mining company, and plaintiff get its
money by doing so; that there was no agreement between
plaintiff company and the mining company, in furnishing the
articles, that the amounts were to be due at the end of each
month, and that the heading on its bills, referred to, is a
printed form on all of the plaintiff's statements; that different

terms were often made as the circumstances required; and that, as each shipment of goods was made, bills were sent, but payment was not required immediately upon shipment.

Norman B. Holter, vice president of the plaintiff company, testified that about 1893, when the Ontario Mining Company first opened its account, its officers wanted to make an arrangement for a line of credit that would meet their circumstances; that they wanted mining supplies to operate their mine near Elliston; that the arrangements were that inasmuch as they could not pay for what they received every month or so, according to the usual line of credit, they could buy the supplies and pay for them when they were in position to do so, after their plant was completed; that at the time these arrangements were made the mill was not in operation, but was being built; that it was understood that plaintiff "would simply carry them (the mining company) from month to month, and charge them interest on their account, on their balances;" that when the arrangements were completed the account was opened, and the mining company purchased from time to time; that the account continued until it amounted to several thousand dollars, when, in November, 1895, they paid up to a certain time, and still kept on buying; that the account was opened under the arrangements just stated, and continued under them; that it was an unpaid, open account; and that the plaintiff relied upon the mining property solely as security for its debt.     On cross-examination this witness testified that there was no arrangement by which the mining company was to buy all of its supplies from the plaintiff company, but that it could buy where it pleased; that the goods ordered were to be paid for when the mining company realized on its shipments of ore; that the plaintiffs did not consider the bills due at the time,—not until the completion of the mill, when the company would be in shape to pay them; that the mill was completed in September, 1895; that, at the time the hardware company made the original contract, the Ontario Mining Company had in contemplation the erection of the mill, or making an addition to it; that at the end of each month a state-

ment from the ledger account was mailed to the mining company, and these statements contained interest accounts; that, according to the agreement, the bills so rendered were not due, but that they were due at the time of the completion of the work; that when the company commenced to' ship ore it was to pay the plaintiff; that, if the mining company wanted to pay its account, it could, but that it was satisfactory to both sides to let the account continue as it was.

P. G. Schroeder, the bookkeeper for the plaintiff, testified that the business relations between the plaintiff and the defendant companies had existed since 1893; that there was an account during that time between the parties,—a current, open account; that there was a settlement between them during the existence of the account; that this settlement was in November, 1895, and that at that time the accounts were settled up to November 1, 1895; that between November 1, 1895, and the date of the payment, which was November 13, 1895, there were other charges made upon the account between the parties; that these charges were upon open account, as formerly; that the date of the last charge was July 20, 1896; and that the balance unpaid upon the account was $4,430.79. On cross-examination, witness stated that the mining company could purchase elsewhere if it saw fit.

O. A. Southmayd, the secretary of the Ontario Mining Company, testified that the account between the plaintiff and the defendant mining company ran along indefinitely from the time the mining company started until it closed down its work, and that articles were ordered from time to time as his company needed them. This same witness was called for the defense, and testified that he did not know of any agreement between plaintiff and the mining company, except for the purchase of a considerable lot of machinery originally bought at the beginning of operations, and that, if there was any agreement at that time that his company was to have credit for any limited amount, he knew nothing of it; that the Ontario Mining Company had paid various sums of money at different times to the plaintiff, and on November 13, 1895,

the sum of $6,855.47 to pay balance due November 1, 1895; that he had no knowledge of any such agreement as was testified to by plaintiff's witnessess; that he understood that bills for materials were due at the end of the month; that the supplies were furnished under separate orders from time to time as they were needed. On cross-examination, witness said: He knew there was an account between the parties, but that he remembered no specific talk in relation to an account. That "it was construed that there was an arrangement between the two companies by which they were to have a line of credit there, and they (the hardware company) would furnish things as we needed them. But I knew nothing definite. If I had not so understood it, I would hardly have ordered material without making some arrangement about a line of credit. As I understood it, as secretary of the company, there was an arrangement between the Ontario Company and the hardware company by which the Ontario Company was to have a line of credit for the materials they wanted for their use for the mine. We used it, anyhow;" that the bills were not paid on the 1st of every month, and that no demand was made for payment every month.

Cornelius Hedges testified for the defendant that he was president of the mining company; that it had had a special arrangement with the plaintiff when the company made the principle purchase of machinery in its early days; that his company settled in full in November, 1895, upon the accounts due prior to that time; that the amount of credit obtained the first time was agreed upon; that that was a specific trade about certain machinery,—a special purchase; that there was no special agreement with the plaintiff company at that time, or at any subsequent time, looking to a general line of credit running up to the time the mine closed; that "when we got goods there, and did not pay for them at the time they were delivered, the agreement or understanding as to when they were payable was that we were to pay as soon as we could realize from the resources of the mine." On cross-examination witness stated that when his company bought the bulk

of the machinery, engine and boiler, there was a special understanding between it and the plaintiff; that they had negotiations, and that it was a special arrangement by which the mining company was to pay for the things it got as soon as it could get the money; that he presumed his company continued trading under that arrangement; that in 1895 there was a general settlement; that everything the company owed up to that time was paid to November 1st; that between November 1st and 13th the account continued as a running account, as far as he knew; and that the mining company continued purchasing on the same account, and under the same arrangement.

The specifications of error relied on are: (1) That the court erred in finding as a fact that the account was fully settled up to and including the 1st day of November, 1895, and during November was fully paid off and discharged. (2) Error is specified, also, in the finding that from and after November 2, 1895, up to and including July 20, 1896, the plaintiff at various times furnished materials to the said mining company, to be consumed in said mine, including many other articles for other purposes, to the amount of $4,430.79, and that these articles were all furnished on credit on account, but in separate bills, and due and payable at the end of each month, with interest for any payment delayed after each bill became due. (3) It is said the court erred in finding that the account contains many articles not used in the mine or mill or concentrator, besides many, the use of which the proof left doubtful, and upon which the court could make no findings as to their use.

Counsel for the hardware company also state that the court erroneously made a conclusion of law to the effect that the account set out in the plaintiff's statement of lien was made upon a series of independent contracts, and that the monthly bills rendered at the end of each month for the purchases during the month constituted a separate and independent account and contract from the bills purchased during other months, and that the court erred in concluding that the separ-

ate bills of purchase did not constitute a continuous and running account, and that all the materials included in the statement of account for materials purchased and delivered prior to May 1, 1896, were not the subjects of a lien upon. the property of the mining company. Error is likewise predicated upon the finding that certain articles were not lienable, and that the bank has a lien upon all the property involved in this action.

1.    During the trial, and on April 7, 1897, leave was granted to amend the answer, and an amendment was filed on April 14th, but was never actually incorporated into an amended answer.    The plaintiff argues that this amendment is not a pleading allowed by law or the rules of practice, and that it can be considered only as an amended answer which superseded the original.    Such being the case, and the amendment failing to deny any of the allegations of the complaint, the plaintiff insists that it is entitled to a judgment upon the pleadings. This contention is without merit.    Section 773 of the Code of Civil Procedure seems to apply to amendments which may be made as of right, and not those which are permissable only by virtue of an order of court.    Under this section a pleading is amended by filing and serving the same as amended. Where, however, leave is granted to amend, the court may require either a copy of the amendment, or the pleading as amended, to be filed and served.    Such is the provision declared by section 683 of the Code of Civil Procedure in respect of complaints, and we think the same rule is, by analogy, to be considered as applicable to answers.    In the case at bar the court allowed the bank to amend its answer, without specifying which of the two courses mentioned should be followed. The defendant chose, as was its privilege, to follow one method, and not the other.    We remark, in passing, that, while either method is proper, the better practice is to file the pleading as amended.    The original answer, therefore, was not superceded by the amendment, except in so far as the former is changed by the latter.

The complaint is also made that the defendant bank had no

lien upon the real property sold to it and upon which the plaintiff is endeavoring to enforce its supposed lien for materials furnished.    The action in which the bank recovered the judgment was commenced in the district court of Lewis and Clarke county.    A writ of attachment was duly issued to the sheriff of Deer Lodge county, the situs of the real property. The writ was executed by attaching such real estate.    Thereafter the judgment in question was obtained in the district court of Lewis and Clarke county, but a transcript thereof was never filed in Deer Lodge county, nor did the sheriff of that county levy upon or attach the property under the writ of execution issued upon the judgment.    It is insisted by the plaintiff that the judgment was not a lien upon the property, because of the omission to file a transcript thereof in Deer Lodge county (section 1200 of the Code of Civil Procedure), and that there was no lien under the execution and sale, because the writ of execution was not returned within 60 days after it was issued, and because the writ of execution was not levied upon the property (sections 1218 and 1224 of the Code of Civil Procedure.)    These contentions, also, are without merit.    The levy of the writ of attachment created the lien. The property was thereby seized and held, and there was no necessity for filing a transcript of the judgment.    The only effect of filing a transcript, it seems, would have been the merger of the lien by attachment into the lien by judgment.    (See *Porter* v. *Pico*, 55 Cal. 165; *Sharp* v. *Baird*, 43 Cal. 577.) An attachment having been levied within the life of the writ, a lien is created, which may be enforced by execution sale without further levy.    The fact that the return of the sheriff was not filed within 60 days after the test of the writ cannot have the effect of destroying the lien created by the levy of attachment.    (*Brusie* v. *Gates*, 80 Cal. 468, 22 Pac. 284; *Blood* v. *Light*, 38 Cal. 652, 99 Am. Dec. 441.)    When the property has been attached under a writ of attachment, there is no occasion for levying thereon a writ of execution.    The lien acquired by the attachment is sufficient.    Suggestion was made on the argument that the validity of the title acquired

by the purchaser at an execution sale is not impaired or affected by the failure of the sheriff to attach or levy upon the property sold. As to this question we express no opinion.

2. The original agreement for a line of credit was specially made with relation to the erection of a mill about to be constructed by the company in undertaking its mining operations, but ran along after the completion of the mill. Under the evidence, we think, however, that it was terminated by the payment on November 13, 1895, when all accounts previous to November 1st were satisfied. From the November settlement on, the credit seems to have been extended upon the supposed value of the property, and the somewhat vague understanding originally had was lost sight of by all parties. Monthly accounts were rendered,—one on December 2d for $592.51, for the month of November. Such monthly accounts were always thereafter rendered until July, during which month the mill was closed down. These accounts were acquiesced in. Doubtless, the hardware company believed it might enforce a lien, and at the same time considered itself perfectly secured by the supposed solvency of the mining corporation, and the value of any concentrates it might produce; but the indulgence of not enforcing collection every month as "a matter of grace" on the part of the hardware company, for the accounts were due and payable at the end of each month.

Transactions such as were had between the plaintiff and the Ontario Mining Company are distinguishable from those wherein supplies are to be furnished for the construction of a building or other structure, where a reasonably, if not perfectly, definite amount of material can be counted upon to be furnished from time to time under one general contract. But purchases for a mining enterprise, made under no special agreement, cannot be considered as constituting a continuing running account. (*Big Blackfoot Milling Co.* v. *Bluebird Mining Co.*, 19 Mont. 456, 48 Pac. 778.) The law will regard each delivery made in such case as a separate and independent contract,—with due regard, however, to the principle

that where the agreement is regarded as a current one for each month, and a statement is rendered monthly, the account will be deemed due each month; so that the time for bringing suit does not arise until the end of the month. (Boisot, Mech. Liens, Sec. 724.) Within this principle are the plaintiff's monthly accounts. As this case is presented, the last item of materials furnished in each month attracted to it all the other items of that month, so that the 90 days within which the statement of lien was required to be filed began to run, as to the accounts for the month, from the day when the last material was delivered. In this sense, the transactions of the month may fairly be regarded as constituting one continuing contract.

## Newton's Case.

Appellant T. P. Newton filed a cross complaint in foreclosure, in which he set forth a copy of a lien he had filed to secure payment for sums due for machinery and supplies furnished to and used by the Ontario company in its mining operations. The Merchants' National Bank, by answer, questioned the validity of the Newton lien, and, as against him, also set up its claim to the property by virtue of the purchase at execution sale. Newton relied upon a written contract dated October 31, 1896, which was as follows:

"Helena, Montana, Oct. 31, 1895.

We hereby agree to furnish the Ontario Mining Co., f. o. b. Elliston, all machinery, etc., contained in list marked 'Exhibit A,' for the sum of six thousand two hundred and nine dollars ($6,209), and will have the said material ready to ship by the first of November. We will also furnish all castings required, in addition, at the rate of $3.15 per 100 pounds, f. o. b. Butte.

[Signed]    Montana Iron Works, T. P. Newton.
The Ontario Mining Co. of Montana,
by Cornelius Hedges, President."

The court awarded Newton a judgment against the mining company for the sum of $6,287.50 and interest, but found

that of this amount he was only entitled to a lien for the sum
$29.22, with interest, for the reason that the account set out
in the statement of lien by Newton was made up of a series
of independent contracts, and that no lien could be enforced
for any of the merchandise included in the account which was
purchased and delivered prior to June 2, 1896; there having
been no materials furnished between April 22d and June 2d.
Newton appeals from the judgment rendered in accordance
with the findings of the court against him, and from an order
denying his motion for a new trial.    The question presented
by Newton's appeal is whether all of the items set forth in
account attached to Newton's lien were furnished under one
contract, or whether the sale and delivery of the various
items were under separate and independent contracts.

In the statement of lien filed by Newton on August 1, 1896,
there is this entry: "Feb. 12, Concentrator machinery, per
contract, $6,209.00." Then follow items, under dates of
February 13th and 15th, amounting to $10. The next item
is of March 12th, at which date one Longmaid became man-
ager of the mine. Longmaid testified that when he went to
the mine the concentrator furnished by Newton was being
built, and was in running order on April 6th or 7th. The
statement shows that in June, 1896, three pairs of eccentrics,
with bolts therefor, charged at $30.15, were delivered to the
mining company; but Longmaid testified that these eccentrics
had no connection with the concentrator Newton furnished,
but were used in repairing an old concentrator which was
added to. Newton charged interest for the $6,209 item for
the concentrator he sold in February, but did not include
interest on the other items contained in his statement of lien.
Hedges, the president of the company, gave the following
testimony as to the clause of the contract concerning castings:
"As to what we had in contemplation when the contract was
drawn and when I put that into it, my recollection is that
there was some part of the castings—just the amount could
not be determined,—and the price was stated to apply to all
that we needed in connection with that bill of work. We had

specifications. There were some things that we could not definitely determine what we did need. That is my understanding. And that was intended to cover them. I had no idea, in connection with the contract, of his furnishing castings necessary for all time that we might run the mine at that price,—simply to complete the contract; to furnish what was necessary in connection with it."

It is to be observed that the contract with Newton bears date October 31, 1895. The first items on the statement of lien are of November 16, 1895, and there are two other items before the item of February 12, 1896. All these articles went into the concentrator machinery, and are within the special contract. But the items of June, which are the only ones brought within the limit of 90 days, were for repairing old machinery, and wholly independent of the machinery included in the first part of the contract. The last clause of the Newton contract was apparently meant to cover all castings which the company might have to buy to complete the concentrator; such castings to be in addition to the machinery, including castings and supplies, covered by the first clause of the contract. The evidence adduced on the trial tended to support this construction as the one put upon the agreement by the parties themselves. Castings bought in June were charged for at the rate of $4 per 100, instead of $3.15. The explanation that this was a bookkeeper's error, not discovered by Newton until he was preparing to try the present case, was not accepted by the trial court, and we cannot disturb the finding that the account was made up of a series of independent transactions or accounts.

### CAIRD & HAWKSWORTH'S CASE.

Caird & Hawksworth also filed a cross complaint, praying for judgment against the mining company for $422.75 and interest, for material sold and delivered to the mining company between March 1, 1896, and July 7, 1896. Judgment was entered for the full amount of their claim against the defendant company, together with interest, but the court de-

creed that they were entitled to enforce a lien to recover the sum of $313.47 only. They also appeal from the judgment and an order denying their motion for a new trial.

These claimants filed their statement of lien upon August 1, 1896. The court held that for mining supplies sold and delivered to the Ontario Company prior to May 1st they were not entitled to a lien, inasmuch as the purchases made each month constituted separate and independent contracts. For the purposes of the enforcement of a material man's lien, we affirm this ruling, as in accord with the decision of *Big Black-foot Milling Co.* v. *Bluebird Min. Co.*, 19 Mont. 456, 48 Pac. 778.

The questions presented by these appeals are very close. They have received our repeated and most careful examination; but, the oftener we have consulted, the more we find ourselves drawn to the conclusion that the proper result, under the statutes, rests in the affirmance of the judgment, and the several parts thereof appealed from, and of the orders of the district court.

It is therefore ordered that the judgment in all respects and the several orders appealed from be affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY, being disqualified, takes no part in this decision.